U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 9, 2008          **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BRENDA COLEMAN CUNNINGHAM, | § | CASE NO. 05-32951-SGJ-13 |
| D E B T O R. | § | |
| | § | |
| BRENDA COLEMAN CUNNINGHAM, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 07-03012 |
| | § | |
| DOVENMUEHLE MORTGAGE, INC., | § | |
| et al., | § | |
| DEFENDANTS. | § | |

### MEMORANDUM OPINION IN SUPPORT OF JUDGMENT AWARDING DAMAGES IN CONNECTION WITH WRONGFUL FORECLOSURE SALE

The following constitutes the court's findings of fact and conclusions of law in connection with the trial on a Complaint filed by Plaintiff, Brenda Coleman Cunningham (hereinafter, "Ms. Cunningham," "Plaintiff," or "Debtor"), against Defendant Dovenmuehle Mortgage, Inc. ("Dovenmuehle") and various others, regarding the allegedly wrongful foreclosure on Plaintiff's home

1

on December 5, 2006, and seeking that the court set aside the foreclosure sale and subsequent sales of her home, and/or award monetary damages and possibly other relief. Where appropriate, any finding that should more appropriately be regarded as a conclusion shall be regarded as such, and *vice versa*. The court reserves the right to supplement or amend these findings of fact and conclusions of law, as necessary.

### FINDINGS OF FACT

1.  This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

2.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.  Ms. Cunningham, the Plaintiff, is currently a Chapter 7 Debtor in her second bankruptcy case filed in Dallas in the past few years. Ms. Cunningham currently works for Citigroup doing what she refers to as "assembly" work, and has no legal training.

### A. Case #1

4.  Ms. Cunningham filed her first bankruptcy case, a Chapter 13 case, on November 6, 2003, Case # 03-81617 (sometimes referred to hereinafter as "Case #1").

5.  Among Ms. Cunningham's creditors listed in Case #1 was Defendant Dovenmuehle, who was the holder of a promissory note in the original principal amount of $16,500, and a deed of trust securing a mortgage on her home at 2433 Volga, Dallas, Texas

75216, dating back to 1978 (the year that Ms. Cunningham actually bought the house).  This home was recently valued at $45,750, according to the Dallas County Appraisal District records submitted as Pl. Ex. 6, and is a 57-year-old, 980 square foot, one-story frame house.

6.    Plaintiff and Dovenmuehle agree that Plaintiff — unlike so many Chapter 13 Debtors who appear in this court — was current on her mortgage at the time of the filing of Case #1, and that she had completed payments for approximately 25 of the 30 years of the mortgage at the time of filing Case #1.  Plaintiff filed Schedules in Case #1 indicating that she owed Dovenmuehle a total balance of a mere $7,000 on her mortgage on the date that she filed Case #1.

7.    Plaintiff asserts that she filed her first bankruptcy case, not because of home mortgage problems, but because of financial problems that befell her from having multiple cars and onerous car payments — most notably, her daughter's car (with regard to which Plaintiff was liable on the car note).  Plaintiff asserts that she always, up through December 2003, made timely mortgage payments to Dovenmuehle (which mortgage payments changed in amount from time-to-time over the years — but she understood from Dovenmuehle's statements that such payments included principal, interest, taxes and insurance), and it was only then (*i.e.,* the month after she filed Case #1) that she stopped making

3

monthly mortgage payments to Dovemuehle, because she believed, based on conversations with her then-attorney, John Hyatt (whom the court notes is a regular consumer bankruptcy practitioner before this court), that Dovenmuehle would be paid by the Chapter 13 Trustee, from the Chapter 13 plan payments that Plaintiff would be making monthly to the Chapter 13 Trustee in her case. In other words, Plaintiff's purported belief was that she did not have to pay Dovenmuehle *directly* anymore during Case #1, that all of her debt payments in her life were being consolidated into one simple payment to the Chapter 13 Trustee, and that the regular monthly mortgage payments owing to Dovenmuehle postpetition would be made to Dovenmuehle from the Chapter 13 Trustee through the Chapter 13 plan (those monthly Chapter 13 Trustee plan payments being $675 per month; the Dovenmuehle regular monthly mortgage payments were approximately $308 per month at the time Plaintiff filed Case #1). Plaintiff testified credibly that she made all required Chapter 13 Trustee plan payments in Case #1. There was no contradictory evidence on this point.

8. However, there was contradiction with regard to the following point. Dovenmuehle denies that the regular home mortgage payments were required to be made to it through the Chapter 13 plan payments during Case #1, but, rather, Ms. Cunningham should have been making her regular mortgage payments of $308.96 per month *directly* to the mortgage company during her

4

case (separate and apart from her $675 per month plan payment to the Chapter 13 Trustee).  Indeed, this is not a surprising position, since this is the way it normally works with Chapter 13 cases in the Northern District of Texas, Dallas Division — *i.e.,* it is typical for only prepetition mortgage **arrearages** to be paid through a Chapter 13 Plan, but not the regular monthly mortgage payments falling due postpetition.  In any event, the evidence showed that Dovenmuehle:  (a) did not ever get paid anything directly by the Debtor during Case #1 after December 2003; (b) **did** get payments through the Chapter 13 Trustee – but only starting in September 2004, after the Final Chapter 13 Plan in Ms. Cunningham's case was confirmed (Dovenmuehle received an aggregate amount of $1,308.42 of payments through the Final Chapter 13 Plan, to be exact); but (c) did not get paid anything close to what would have been its regular monthly mortgage payments during Ms. Cunningham's first Chapter 13 case (which lasted 16 months).  The evidence was also that Dovenmuehle never filed a motion to lift stay, nor did it otherwise file or serve any notification complaining that it was not receiving regular monthly mortgage payments during the 16 months of Case #1.

9.   This court can take judicial notice of the official record in the bankruptcy cases of Ms. Cunningham, and feels compelled to do so in certain respects, in light of the inconsistency in the parties' positions and lack of clarity of

some of the testimony in this matter.  Accordingly, the court
takes judicial notice of the following items of record in Ms.
Cunningham's first bankruptcy case.  First, looking at DE # 1
from her first bankruptcy case (*i.e.,* the Debtor's Voluntary
Petition and original Schedules and Statement of Financial
Affairs),[1] Ms. Cunningham listed in her "Schedule D" filed in her
case that Dovenmuehle was owed $7,000 as of the November 6, 2003
Petition Date (and there was a narrative "Remark" next to the
Dovenmuehle claim description that read, "All in Plan," which,
frankly, was an unusual remark, since, first, as earlier
mentioned, it is the typical practice in the Northern District of
Texas, Dallas Division, for a Chapter 13 Debtor to make her
regular postpetition mortgage payments directly to the mortgage
lender and only pay mortgage ***arrearages –*** *i.e.,* prepetition
arrearages – through a plan, and, second, the Debtor, as earlier
indicated, did not owe any prepetition mortgage arrearages to
Dovenmuehle as of the November 6, 2003 Petition Date).  In any
event, the court takes judicial notice of the following
additional items from Ms. Cunningham's first bankruptcy case:
she listed on her "Schedule D" that she had $24,000 of secured
debt in connection with her daughter's Cadillac Seville, which
the daughter was going to pay directly; she also listed on her

---

[1] The abbreviation "DE #____" used herein shall refer to docket
entry numbers from the official file in Ms. Cunningham's general
bankruptcy case.

"Schedule D" that she had approximately $22,000 of secured debt
in connection with a Jeep Liberty that she was going to pay
through the plan; additionally, the Debtor showed she had a $733
priority IRS debt that she was going to pay through her Plan;
finally, Ms. Cunningham listed about $11,000 in credit card and
other unsecured debts in her "Schedule F." Ms. Cunningham's
"Schedule I" (which is required to report all income earned by a
debtor) showed that the Debtor earned net income of $2,257 per
month working at her then-job at Sears NCIC and was receiving
about another $549 per month from her daughter to make her
daughter's car payment. Then significantly, Ms. Cunningham's
"Schedule J," which shows the Debtor's monthly expenses that she
swears she will be paying prior to turning over remaining
disposable income to the Chapter 13 Trustee for plan payments,
contemplated that Ms. Cunningham would pay $308.96 per month for
home mortgage payments; that she would also pay $549 outside the
plan for her daughter's Cadillac—presumably a "flow through" from
the daughter who would actually fund the money; and, after
deducting certain other budgeted personal expenses such as for
utilities, food and other necessities, there would be $675 per
month left that would be paid monthly to the Chapter 13 Trustee
for Ms. Cunningham's monthly Chapter 13 Trustee plan payment.
Turning, next, to Ms. Cunningham's "Final Chapter 13 Plan"
confirmed in her first case, DE # 14, it showed that she would

7

have a 59-month plan, with plan payments of $675 per month, for a total plan base of $39,825.  Of that $675 per month plan payment, there would be a $418.83 per month payment on the Jeep Liberty during months 1-34, there would be payments made toward her attorney's fees; there would be pro rata payments to pay a 1% dividend to her unsecured creditors, which—after proofs of claim came in—ended up being about $13,400 worth of unsecured creditors.[2]  But, the most important point of which the court takes judicial notice is that the Final Plan indicates at Section D entitled "Home Mortgage" that there was an **arrearage** amount of $6,153.09 owed to Dovenmuehle through November 2003, and that this so-called **arrearage** would be paid at 8% in months 1-35 of the Plan, and that "Regular payments beginning 12/03 to be paid direct."  So clearly, the "Final Chapter 13 Plan" was drafted as though:  (a) there was a $6,153.09 **arrearage** owing to Dovenmuehle that would be cured and paid through the $675 per month Chapter 13 plan payment, and also (b) that the regular $308.96 mortgage payments falling due in the future would be paid directly by the Debtor to Dovenmuehle.

    10.  Now, why would the "Final Chapter 13 Plan" be

---

[2] The Plan shows the IRS never filed a proof of claim in Ms. Cunningham's first case.  Also, the Plan does not mention the daughter's Cadillac.  The court takes further judicial notice that the automatic stay was terminated for the car lender on this Cadillac in an Order dated April 15, 2004 [DE #11].

mistakenly drafted this way?[3] Well, the court concludes that the
mistake (if it is to be blamed on anyone) lies at the feet of
both Debtor's counsel and maybe Dovenmuehle. First, as to
Dovenmuehle, the court takes judicial notice that Dovenmuehle
filed a proof of claim [Claim No. 3] in Ms. Cunningham's first
bankruptcy case, on December 3, 2003, in the actual amount of
$6,153.09 (which would supersede the $7,000 amount that the
Debtor listed in her "Schedule D" and would be deemed the allowed
amount). Fed. R. Bankr. P. 3001(f). This is the amount that was
put in the Final Chapter 13 Plan, but incorrectly labeled as an
arrearage. However, Dovenmuehle's proof of claim is a little
confusing, to put it kindly. On the one hand, the first page of
the proof of claim seems to clearly indicate that $6,153.09 is
the *total* amount of its claim (including all principal and
interest) and is not merely an arrearage. On the other hand, the
page 2 "Exhibit A" attachment to Dovenmuehle's proof of claim has
a shocking problem that no one bothered to point out at trial.
Page 2 "Exhibit A," reads, near the top, plain as day, right
after Ms. Cunningham's name, case number, and loan number, the
words: "Unpaid Principal Balance: $181,749.76," and then there

---

[3] The court notes that "Debtor's Preliminary Chapter 13 Plan,"
that the Debtor's counsel filed at the beginning of Case #1, listed no
home mortgage at all (putting "N/A" in the section of the plan where
home mortgages are to be disclosed), yet oddly listed Dovenmuehle
with a $7,000 secured claim to be paid through the plan at another section
in the plan wherein non-mortgage type secured creditors are to be
listed. [DE #2.]

are two columns underneath that are wholly inconsistent with the notion of there being a $181,749.76 principal balance — one showing no prepetition arrearages owing by the Debtor, and the other column itemizing the principal, interest and charges that add up to a total claim of $6,153.09.

11.   The court cannot be sure how much attention was paid to this $181,749.76 claim assertion in Dovenmuehle's page 2 "Exhibit A" to its proof of claim and whether it contributed to the error in the Final Chapter 13 Plan, or whether the strange narrative in the Debtor's "Schedule D" ("All in Plan") suggests that the Debtor's counsel had a misunderstanding about there being an arrearage owing to Dovenmuehle, but the fact is that the Debtor's Final Chapter 13 Plan in her first case was inaccurately prepared[4] as though she had a $6,153.09 *arrearage* owing to Dovenmuehle that she would cure through her $675 per month plan payments *and* that she would additionally be paying Dovenmuehle directly $308.96 per month.  This plan was confirmed by the court in September 2004.

12.   Accordingly, does the court believe Ms. Cunningham's testimony that she believed that she did not have to pay Dovenmuehle directly after the filing of her first bankruptcy

---

[4] The court notes that the Chapter 13 Trustee's Office actually prepared the "Final Chapter 13 Plan," in accordance with the usual protocol, but he sent it to the Debtor and Debtor's counsel to review for accuracy and to sign — which the Debtor did.

case and that Dovenmuehle would be getting paid directly from her $675 per month plan payments? Absolutely. After all, why would she think Dovenmuehle should have been getting *two* payments each month — one from Ms. Cunningham directly and one from the Chapter 13 Trustee — when Ms. Cunningham was indisputably current with Dovenmuehle going into her first bankruptcy case? Moreover, Dovenmuehle never filed a motion to lift stay or otherwise file any pleading during the 16 months of Case #1 indicating it had not received payments as required. Moreover, if Ms. Cunningham read her attorney's initial paperwork he prepared for her — namely "Schedule D" [DE #1] and the Preliminary Chapter 13 Plan [DE # 2], they clearly suggested that this is how it would work (*i.e.,* that Dovenmuehle would simply be paid through the plan) although "Schedule J," admittedly, suggested otherwise. But the fact is, both the Final Chapter 13 Plan and Ms. Cunningham's understanding were all wrong. Ms. Cunningham should have paid Dovenmuehle directly $308.96 per month throughout the life of her first case (this is what "Schedule J" and her original plan payment calculation contemplated); no prepetition *arrearage* (per se) should have ever been put in her first plan (as there was none); and the Trustee should have never paid Dovenmuehle anything from the $675 per month plan payment (*i.e.,* this plan payment should have all gone toward payment of other creditors). Again, the mistake here, if it should be blamed on anyone,

11

probably lies at the feet of Debtor's counsel, for incorrectly signing off on a "Final Chapter 13 Plan" that was prepared as though a prepetition arrearage existed as to Dovenmuehle, and for not better communicating with his client from the beginning (indeed, preparing a "Schedule D" and a "Preliminary Chapter 13 Plan" that suggested that Dovenmuehle — although owed no arrearage — would be paid through the plan, and yet preparing a "Schedule J" that suggested otherwise).[5] And the court believes, possibly, some blame lies at the feet of Dovenmuehle, for very likely adding to the perception that there was an arrearage owing to it (*i.e.,* of $6,153.09), because of the inexplicable, erroneous $181,749.76 "unpaid principal balance" number that was on page 2 of its Proof of Claim.[6]

13. Now, fast forward from September 2004 (the time Ms. Cunningham's "Final Chapter 13 Plan" in Case #1 was confirmed) to March 2005. On March 8, 2005, the court dismissed Ms. Cunningham's first bankruptcy case, as a result of the Chapter 13 Trustee's motion to dismiss for the Debtor's failure to pay postpetition income taxes. *See* Def. Ex. 1 & Def. Ex. 2.

---

[5] As earlier noted, "Schedule D" and the "Preliminary Chapter 13 Plan" are inconsistent with "Schedule J" which contemplated that the Debtor would directly pay her home mortgage and computed a $675 plan payment based on that assumption.

[6] In other words, the "Final Chapter 13 Plan" preparer may have reasonably concluded from this sworn Proof of Claim that $6,153.09 was the arrearage amount, but there was a greater ($181,749.76) total unpaid principal balance owing to Dovenmuehle.

14.   The Trustee's Final Report, Pl. Ex. 5, showed that,
during the first Chapter 13 case, the Trustee paid Dovenmuehle
$664.95 of principal and $643.47 of interest.  So $1,308.42 was
paid to Dovenmuehle during the entire first Chapter 13 case (all
through the Plan).  Again, the Debtor admits she never paid
Dovenmuehle directly after December 2003 (thinking she did not
have to).  Thus, from January 2004 through March 2005 (*i.e.,* 15
months), instead of Dovenmuehle getting paid $308.96 per month
times 15 months, which would equal $4,634.40 worth of payments,
Dovenmuehle received $1,308.42 worth of payments from the Trustee
(leaving a roughly $3,325.98 shortfall or arrearage at that
point – not counting any default interest or late fees or other
fees, charges, escrows, or adjustments that Dovenmuehle's loan
documents permitted).  Thus, it is undeniable that an arrearage
was clearly owing to Dovenmuehle by the time that Ms.
Cunningham's first case was dismissed on March 8, 2005.  However,
the court cannot help but observe the timing of when Dovenmuehle
was paid during Case #1.  The testimony was that it was paid
nothing from December 2003 (*i.e.,* one month after Case #1 was
filed) until September 2004 (*i.e.,* the time that the "Final
Chapter 13 Plan" was confirmed in Case #1).  Then it was paid
$327.94 in September 2004; $196.09 in October 2004; $196.10 in
November 2004; $196.09 in December 2004; $196.10 in January 2005;
and $196.10 in February 2005.  Def. Ex. 4.  The court finds it

13

rather relevant that Dovenmuehle — as it was receiving less than it was entitled to, through only these plan payments, month after month, and when receiving nothing directly from Ms. Cunningham — said and did nothing.  The court is not suggesting that laches or any other equitable waiver doctrine is relevant as to Dovenmuehle during Case #1.  The court is simply noting this as further evidence of why it is so very credible that Ms. Cunningham did not believe she was supposed to be paying Dovenmuehle anything directly in Case #1.  No one said anything to her in 15 months as to why she was not paying Dovenmuehle directly.  There is absolutely no evidence that anyone alerted her to the fact that anything was amiss.  No motions to lift stay were filed by Dovenmuehle; no correspondence from Dovenmuehle to her attorney was introduced into evidence.  Thus, again, this court has no problem believing Ms. Cunningham when she says she thought everything was essentially on course, since she was always making her regular monthly plan payments during Case #1.

B.  Case #2

    15.  Next, fast forward to nine days after the dismissal of Ms. Cunningham's Case #1.  On March 17, 2005, she filed a second Chapter 13 case with a new lawyer, Chris Barber, Case # 05-32951, another seasoned consumer bankruptcy lawyer who regularly practices before this court ("Case #2").  This case is still pending as of the time of trial of this matter.  Case #2 was

14

converted to a Chapter 7 case on January 12, 2007.

16. Ms. Cunningham testified that Mr. Barber did not really file the second case at her direction and that she had communication problems with him. In fact, Ms. Cunningham suggests that she has been a victim of bad advice and lack-of-good communication all around – from her attorneys, to the Chapter 13 Trustee, to Dovenmuehle, and even maybe from the court system. Specifically, she said that her daughter's car was surrendered during Case #1 [see DE # 11 in Case #1], and that she really did not need bankruptcy protection thereafter. She further testified that her problems with Dovenmuehle not getting paid the correct amounts basically stemmed from her not needing to be in bankruptcy after she surrendered her daughter's car and due to no one adequately informing her of how Dovenmuehle was to be paid and when. Again, the court does find credible the statement that Ms. Cunningham was confused about how Dovenmuehle was to be paid and that she was not communicating well with lawyers. However, the court does not find entirely credible Ms. Cunningham's statement that she did not authorize Case #2 or that she did not feel the need or want to be in bankruptcy after 2004.

17. Rather, her testimony in this regard is undermined by the fact that Ms. Cunningham obviously went out and very quickly found a new bankruptcy lawyer (Chris Barber, replacing John Hyatt) after the dismissal of her first case.

15

18.    Moreover, in Case #2, the court takes judicial notice, reviewing DE #4, that Ms. Cunningham (even without the daughter's Cadillac still in the picture) actually had very sizeable debt problems, separate and apart from Dovenmuehle, for a person of her income level and means.   DE #4 in Case #2 shows that Ms. Cunningham listed in her "Schedule D" the 2002 Jeep Liberty with $21,000 of secured debt owing against it.   She listed Dovenmuehle, this time showing the balance owing to it of $5,600 – this time with no remark in "Schedule D" about the mortgage being paid "in plan."   This time, Ms. Cunningham listed (unlike in Case #1) a $10,000 priority debt owing to the IRS in "Schedule E."    Ms. Cunningham also listed about $12,000 of unsecured debt, largely credit cards.   In her new "Schedule I," Ms. Cunningham again listed $2,257 of monthly take home income, but now she showed her employer as "Citi" for whom she indicated she had worked as a clerk for two years.   The point is, with an expensive $400+ per month car payment, a $10,000 IRS priority claim that at some point surfaced after the filing of Case #1, and $12,000 of unsecured debt, **plus** the Dovenmuehle mortgage (manageable as it, in isolation, may have been), Ms. Cunningham, who was earning just $2,200 per month and was single, easily seemed to be a person who might be in need of rehabilitation in bankruptcy.

18.    In any event, Ms. Cunningham testified that, once again, she thought Dovenmuehle would be paid in her second case

16

entirely through her plan. Once again, even though it is highly atypical for a Chapter 13 debtor to make regular monthly mortgage payments through a plan in this District and Division, the record corroborates her belief in Case # 2 — at least for the first few months of Case #2. The "Preliminary Chapter 13 Plan" filed in the Debtor's second case [DE #7] showed that she had no home mortgage (incorrectly), yet showed a total amount owing to Dovenmuehle (under the general secured creditor section of the plan) of $5,600 that would be paid through the plan. The plan payment was shown to be $750 per month. Moreover, in this second bankruptcy case, unlike her first case, Ms. Cunningham's "Schedule J" *showed no direct home mortgage payments being deducted out from her monthly budget in computing her $750 per month plan payment.* Thus, it is easy to see why, for the first few months of Case #2, Ms. Cunningham believed she only needed to make one $750 per month plan payment to the Chapter 13 Trustee and no direct payments to Dovenmuehle — this is, indeed, the way her lawyer initially set up her case. Then, as Case #2 progressed, events happened to change all this. First, Dovenmuehle filed a proof of claim [Proof of Claim No. 3], swearing that it was owed a $4,087.51 prepetition arrearage and an overall claim of $9,093.48, as of April 2005. But to add to the comedy of errors in this passion play – and certainly fueling some Ms. Cunningham's arguments that she has been a bit of a

17

victim of the system and that a lot of miscommunications and mistakes on many people's parts had been made – Dovenmuehle, a few days later, filed a **$50,109.23** proof of claim [Proof of Claim No. 7] in Ms. Cunningham's case (which reflected the wrong obligor name and the wrong bankruptcy case number).  This was clearly an error — Dovenmuehle admitted this and attributed the error to the Bankruptcy Clerk in a later pleading it filed in Case #2 [DE #16].[7]  But the point is that this led to extra paperwork on the Trustee's part and the Debtor's part in having to object to this mis-filed proof of claim.  [DE # 12 and 13] The further official record in Case #2 shows that, ultimately, Dovenmuehle objected to the Debtor's Final Chapter 13 Plan [DE # 16], which Plan, even when later modified to reflect the $9,093.48 overall Dovenmuehle claim [DE # 13], did not seem to provide treatment for the Dovenmuehle claim in the manner required by Section 1322 of the Bankruptcy Code.  Dovenmuehle also moved for relief from the stay [DE #17] in February 2006 (at this point 11 months after the filing of Case #2), arguing that it was not adequately protected because now, in addition to the $4,087.51 prepetition arrearage, there was also another $3,884.65

---

[7] The court takes judicial notice of the official Claims Register in Case #2, and notes that the error was actually the fault of Dovenmuehle's counsel, not the Bankruptcy Clerk's, as the official Claims Register in Case #2 reflects that a Stephen Moriarty (counsel for Dovenmuehle who signed Proof of Claim No. 7) personally electronically filed/docketed the proof of claim in Ms. Cunningham's case through the PACER/ECF system.

postpetition arrearage.  The Debtor responded through her
attorney to this motion to lift stay [DE #20], acknowledging that
there was some arrearage, but not admitting how much.  Then, the
most important two events of Case #2 transpired.  On March 28,
2006, an Agreed Order was entered into between the Debtor and
Dovenmuehle, in which the parties agreed ("March 28, 2006 Agreed
Order") [Def. Ex. 7]:  (a) there was a $4,087.51 prepetition
arrearage; (b) there was a ***$9,799.18*** postpetition arrearage (this
sounds shockingly high, partly because there was an agreement
that Dovenmuehle was entitled to include $5,622.55 of
postpetition escrow charges in its postpetition arrearage);[8] (c)
there was an overall arrearage owed to Dovenmuehle of $13,886.69
and the Debtor would roll that into her Chapter 13 plan and pay
it with 8% interest through her 60-month plan; (d) there was an
agreement that the Debtor would make future regular monthly
mortgage payments directly to Dovenmuehle (and failure to do so
would result in termination of the stay); and (e) there was also
an agreement that the Debtor would secure confirmation of a plan
in 45 days or the stay would terminate without further order of
the court.  The next day, an Order Confirming Plan was signed by

---

[8] The court notes that there was credible evidence [Def. Ex. 29]
that on several occasions (after Plaintiff's first bankruptcy case)
Dovenmuehle purchased "forced placed insurance" on the homestead when
it did not receive proof of Debtor's keeping insurance in place and
each time this was at an annual premium of well over $1,000.  There
was also evidence of Dovenmuehle having paid property taxes and
attorney's fees relating to the homestead.  [Def. Ex. 27.]

19

the court [DE# 24], essentially modifying the Final Chapter 13
Plan to incorporate the $13,886.69 Dovenmuehle arrearage being
put in the Final Chapter 13 Plan, which would be paid from the
Debtor's plan payments, which plan payments were to be increased
from $750 per month during months 1-12 (which had already expired
at this point in time in Case #2) up to $900 per month during
months 13-60 of the plan. Thus, beginning in April 2006, the new
landscape in Ms. Cunningham's Case #2 was that she would have to
pay roughly $1,200 per month (*i.e.*, $900 per month to the Trustee
and roughly $300 per month directly to Dovenmuehle) to stay in
compliance with the orders entered by the bankruptcy court in her
Chapter 13 case and to keep her home and other property.

    19. The Debtor testified emphatically and consistently that
she never understood that Dovenmuehle was ever to be paid
directly in **either** of her cases. She testified that she never
received a copy of the March 28, 2006 Agreed Order that specified
the $13,886.69 arrearage, and that she never understood that she
was required to make not just her plan payments (at the increased
level of $900) plus the regular mortgage payments directly to
Dovenmuehle from then on. The evidence reflected that Dovenmuehl
subsequently received a direct payment from Ms. Cunningham after
entry of the March 28, 2006 Agreed Order – possibly contradicting
her testimony that she never saw the March 28, 2006 Agreed Order
or knew about its terms. But the court actually finds it quite

plausible that Ms. Cunningham either cannot remember seeing the
March 28, 2006 Agreed Order or that she misunderstood from her
attorney how things would work from that point forward.  Ms.
Cunningham indicated that she thought she had to make just one
direct payment to Dovenmuehle at that point, to resolve its
motion to lift stay, but that she thought that it was a one-time
direct payment, and that, going forward, her plan payments were
increasing to $900 per month to deal with the past underpayments
to Dovenmuehle.  That Ms. Cunningham would believe this is not so
farfetched.  After all, Ms. Cunningham started off with $650 per
month plan payments in Case #1.  She credibly testified that she
was under the mistaken belief in Case #1 that the $650 payment
would encompass the Dovenmuehle $308 per month payment (and the
record in that case can reasonably be construed to have
contributed to that confusion).  Two and a half years later, in
Case #2, the Debtor had a $900 per month plan payment.  Is it
farfetched that Ms. Cunningham (who had thought that the original
$650 per month payment encompassed the $308 per month Dovenmuehle
payment, but now understanding that it did not and there was an
arrearage owing to Dovenmuehle) would now think that a $900
payment would "make things right" with Dovenmuehle – especially
when one considers that it is, at this point, 2006 and the 30-
year mortgage was due to be completed in 2008, and it was a 5-
year plan?  No.  Once again, the court finds it credible that Ms.

21

Cunningham was confused. While those in the system who handle Chapter 13 cases all the time in this District and Division know that it is the norm to make regular postpetition mortgage payments directly to the mortgage lender and to separately deal with mortgage arrearages through the plan payment, Ms. Cunningham is not an expert in Northern District of Texas bankruptcy practice, and there is plenty in the record before this court that corroborates that she could have legitimately been confused. The court believes she was confused and thinks she had ample reason to be.

## C. Post-Confirmation Defaults with Dovenmuehle:  The Five Notices.

20.  Fast forward now to mid-2006.  The evidence was that Dovenmuehle eventually started sending various notices of default to Ms. Cunningham, since she was not making regular monthly mortgage payments to it.  The five notices that were introduced and admitted into evidence were as follows:

(a)  The first such notice of default was a letter dated July 26, 2006 ("July 26, 2006 Notice"), which was sent by certified mail to Ms. Cunningham and her attorney, and which the evidence showed was received by her attorney, but the letter sent to Ms. Cunningham (at her home address) was returned to Dovenmuehle as unclaimed by her.  [Def. Ex. 10.]  The July 26, 2006 Notice is essentially a notice of default under the terms of the March 28, 2006 Agreed Order.  Significantly, it gives Ms. Cunningham *10 days* to cure her default under the March 28, 2006 Agreed Order or else Dovenmuehle would pursue its available remedies (the significance of the *10-day* cure language will be discussed later).

(b)  Another notice of default was admitted into evidence without opposition, which is a letter dated September

22

19, 2006 (the "September 19, 2006 Notice"), and the letter
indicates near the top that it was to be sent to Ms. Cunningham
by certified mail.  [Def. Ex. 11.]  However, there was no
testimony from Ms. Cunningham confirming receipt of it, and (more
importantly) no testimony from Dovenmuehle that it did indeed
send it, and no proof of service offered into evidence, such as a
green card or returned mail.  Thus, the court considers the
September 19, 2006 Notice as irrelevant.  There is no proof this
was anything other than a computer generated notice that never
was sent out.

   (c)  Another notice of default was sent to Ms.
Cunningham in a letter dated October 24, 2006 (the "October 24,
2006 Notice"), which letter indicated that her matter had been
referred to attorneys who had instructions to proceed with
foreclosure efforts.  [Def. Ex. 12.]  Ms. Cunningham admits to
receiving this notice.  The evidence shows that this October 24,
2006 Notice was sent by **_regular_** (not certified) mail.

   (d) Then, on November 1, 2006, yet another notice of
default was sent to Ms. Cunningham, this time by certified mail,
and this letter was styled as a "Fair Debt Collection Practices
Act Notification," and indicated that the amount required to cure
defaults was $8,636.38, and also indicated that the total amount
required to pay-off the loan $10,999.04.  [Def. Ex. 13.]  This
November 1, 2006 letter (the "November 1, 2006 FDCPA Letter")
gave Ms. Cunningham 30 days after her receipt of the letter to
dispute the debt in writing, and the letter also indicated that,
meanwhile, Dovenmuehle was pursuing the foreclosure process with
regard to the homestead.  The evidence confirmed Ms. Cunningham's
testimony that she did not see the contents of this letter – the
letter sent to Ms. Cunningham (at her home address) was returned
to Dovenmuehle as unclaimed by her.

   (e) Finally, on November 13, 2006, a notice of
foreclosure sale was sent to Ms. Cunningham (the "November 13,
2006 Foreclosure Sale Notice"), by certified mail [Def. Ex. 14],
indicating that Dovenmuehle intended to conduct a nonjudicial
foreclosure sale of the homestead on December 5, 2006 at the
Dallas County Courthouse.[9]  Once again, the evidence indicated

---

[9] The court admitted Def. Ex. 13 and Def. Ex. 14 into evidence
over the vehement objection of Plaintiff's counsel, who claimed that
he never received these documents in pretrial discovery and that they
had not been properly identified by Dovenmuehle as potential exhibits
at trial.  In response to these allegations, Dovenmuehle's counsel
produced to the court Def. Ex. 28, which allegedly was a hard copy of

that this letter was returned to Dovenmuehle as unclaimed by Ms. Cunningham.[10]

## D.  The Ultimate December 5, 2006 Foreclosure Sale.

21.  The evidence was that a flurry of activity occurred on the Friday (December 1, 2006) and Monday (December 4, 2006) before "Foreclosure Tuesday" (December 5, 2006), in an effort by Ms. Cunningham to stop the foreclosure.  Specifically, Ms. Cunningham credibly testified that she realized her homestead was

---

the full set of pretrial discovery produced by Dovenmuehle to Plaintiff, that indeed contained Def. Ex. 13 and Def. Ex. 14.  In further response to this, Plaintiff's counsel produced to the court Pl. Ex. 9 (an actual disk containing an electronic file of what electronic documents he said he received from Dovenmuehle's counsel), and it contained over 90 pages of documents.  Conspicuously, Pl. Ex. 9 did **not** include Def. Ex. 13 and Def. Ex. 14.  Thus, the court was confronted with two officers of the court making two very different representations about what was produced in discovery.  In the interests of justice, and because the court believed Def. Exs. 13 and 14 were such critical items of evidence, the court admitted Def. Ex. 13 and Def. Ex. 14 into evidence.  However, the court has become increasingly troubled (after deliberating over all of the evidence) by the Plaintiff's counsel's representation that these were not produced in discovery because, as later explained in the Conclusions of Law section herein, Defs. Exs. 13 and 14 turned out to be the most relevant evidence to Plaintiff's wrongful foreclosure claim (*i.e.,* one might say the proverbial "smoking guns").  Defs. Exs. 13 and 14 reveal a flaw in Dovenmuehle's foreclosure process and, if it is true these items were not produced in discovery, then it is not hard to jump to the conclusion that perhaps Dovenmuehle **was** indeed trying to ambush Plaintiff's counsel at trial in the hopes that he would not have time to study Defs. Exs. 13 and 14 carefully and realize the problem that they revealed about the foreclosure process.

[10] The court notes that certain of the notices described herein were also sent to a Floyd Cunningham, who apparently is Ms. Cunningham's ex-husband and, the evidence indicates, was originally a co-maker on the note and himself earlier received a discharge in a separate individual bankruptcy case.  [Def. Ex. 11, 12, 13, & 14.]  There is no evidence indicating he ever accepted service of any of these notices.

posted for foreclosure, not because she had seen the November 1, 2006 FDCPA Letter or the November 13, 2006 Foreclosure Sale Notice, but because she started receiving solicitations in the mail from foreclosure relief services companies.  Upon receiving these, she called Dovenmuehle and learned that her home was scheduled for foreclosure.  Ms. Cunningham then retained her counsel of record herein with the assistance of her daughter (a paralegal).  Her counsel made phone calls to the law firm representing Dovenmuehle on Friday December 1, 2006 and Monday December 4, 2006, in an attempt to negotiate a forbearance agreement and stop the foreclosure sale.

22.  In fact, Ms. Cunningham's counsel argues that he had an agreement with Dovenmuehle to stop the foreclosure.  But the court finds that there is no credible evidence of any such agreement.  The evidence, rather, is that Ms. Cunningham's efforts were too little, too late.  The credible evidence was that Ms. Cunningham's counsel talked to a paralegal for the law firm representing Dovenmuehle, and memorialized his conversations in a letter he sent to the paralegal dated Monday, December 4, 2006 [Pl. Ex. 7], but, unfortunately, that paralegal missed work for several days starting on "Foreclosure Tuesday," and the evidence suggested that no messages ultimately got through to Dovenmuehle in time to possibly convince them to stop the foreclosure.  The one and only item offered by Plaintiff as

25

evidence of a possible agreement with Dovenmuehle to stop

foreclosure, counsel's December 4, 2006 letter, [Pl. Ex. 7], is

clearly neither a binding agreement, nor even a communication

with anyone who had authority to bind Dovenmuehle.

**E.  Property Conveyances to Unrelated Third Parties.**

23.  Finally, on December 5, 2006, Dovenmuehle conducted a

foreclosure sale on Ms. Cunningham's home.

24.  At the time of trial, there was much water under the

bridge regarding the foreclosure and conveyance of Ms.

Cunningham's home, with there being third-party good faith

purchasers for value, who had no reason to know of any of the

preceding saga and who had obtained financing for the purchase of

the house.  Specifically, it is stipulated that:

> (a)  On December 5, 2006, Defendant Easterview Trust
> #2433, an unrelated third party, purchased the property at the
> foreclosure sale for the amount of $14,500.

> (b)  On December 8, 2006, Shelly Ortolani, acting as
> Substitute Trustee, conveyed the homestead by Trustee's Deed to
> Easterview Trust #2433.

> (c)  Then, also on December 8, 2006, Easterview Trust
> #2433 conveyed the property to Couch Enterprises, LLP, by
> Warranty Deed dated December 2006.

> (d)  Further on December 8, 2006, Couch Enterprises,
> LLP sold the subject property to O.C.C.M., Inc. for the price of
> $24,000.  At the closing, O.C.C.M., Inc. paid taxes on the
> property totaling $1,274.50, attorney's fees of $200, and
> recording fees of $52.  Couch Enterprises, LLP conveyed the
> property to O.C.C.M., Inc. by Warranty Deed with Vendor's Lien.

> (e)  O.C.C.M., Inc.'s purchase was funded by a loan it
> obtained from an Anthony Darwin in the principal amount of
> $25,000, at an annual interest rate of 14%.

26

(f) On January 4, 2008, Anthony Darwin assigned and transferred the note and lien to Couch Enterprises, LLP. Interest on the noted dated December 8, 2006 totals $3,412.37, from December 8, 2006 through January 20, 2008, and has continued to accrue at $9.59 per day.

## ISSUE

The issue before this court is whether there was a wrongful foreclosure sale on Ms. Cunningham's home and, if so, whether the sale should be set aside or monetary damages awarded.

## CONCLUSIONS OF LAW

### A. Was the Foreclosure Sale Properly Noticed and Otherwise Statutorily Compliant?

1. Surprisingly, the evidence indicates that Dovenmuehle did not follow the required statutory steps to properly conduct a nonjudicial foreclosure sale with regard to Ms. Cunningham's home. Specifically, the evidence reflects that Dovenmuehle did not follow the *two-step notice process* contemplated by Tex. Prop. Code § 51.002(d) and (b).

2. In order to pursue the remedy of a nonjudicial foreclosure sale on a homestead in Texas, there is a prerequisite that the mortgage servicer of the debt shall first serve upon a debtor who is in default a written notice, by *certified* mail, stating that the debtor is in default and giving the debtor at least *twenty* days to cure the default *before* notice of an intended foreclosure can be given. Tex. Prop. Code § 51.002(d).

3. Then, assuming there is no cure within that first 20-day

27

notice period, a subsequent notice of a foreclosure sale can be given, providing at least 21 days notice of the intended sale (with sales occurring on the first Tuesday of the month in Texas, the so-called "Foreclosure Tuesday"). This second notice must also be made by *certified* mail on each debtor who is obligated on the debt. Additionally, the notice of foreclosure sale must be posted at the courthouse door of the county in which the property is located and must be filed in the office of the county clerk. Tex. Prop. Code § 51.002(b).

4. In summary, there are *two certified mail notices* and *two time periods* that must run pursuant to Tex. Prop. Code § 51.002(d) & (b).

5. Here, while there were five Dovenmuehle notices put into evidence, these notices did not meet the Texas two-step requirements of Tex. Prop. Code § 51.002(d) & (b). Finding of Fact #22 above described the five notices that were put into evidence. The court addresses them below:

(a) The July 26, 2006 Notice [Def. Ex. 10]. As earlier stated, this notice was essentially a notice of default under the terms of the March 28, 2006 Agreed Order. More importantly, it only gave Ms. Cunningham *ten* days to cure her default under the March 28, 2006 Agreed Order or else Dovenmuehle would pursue its available remedies. Thus, this notice did not give the Debtor *20* days notice to cure as contemplated by Tex. Prop. Code § 51.0002(d). The court realizes that, as a practical matter, Ms. Cunningham had far more than 20 days to cure her default (since the foreclosure sale did not occur until December 2006—approximately 130 days later), but the court will address further below why this extra time she essentially received simply does not matter.

28

(b)  The September 19, 2006 Notice [Def. Ex. 11].  As earlier indicated, there was no testimony at trial from Ms. Cunningham confirming receipt of this, and, more importantly, no testimony from Dovenmuehle that it indeed sent this notice, and no proof of service offered into evidence, such as a green card or returned mail.  Thus, the court considers the September 19, 2006 Notice as wholly irrelevant.  Accordingly, this notice did not give the twenty days notice to the Debtor to cure contemplated by Tex. Prop. Code § 51.0002(d).

(c)  The October 24, 2006 Notice [Def. Ex. 12].  The evidence showed that this October 24, 2006 Notice was sent by *regular* (not certified) mail.  Thus, this notice did not give the twenty days notice to the Debtor to cure contemplated by Tex. Prop. Code § 51.0002(d), since it was not sent *certified* mail. So this notice too was wholly irrelevant.

(d)  The November 1, 2006 FDCPA Letter [Def. Ex. 13]. The evidence showed that this notice was sent certified mail to Ms. Cunningham, and did indeed give her the amount required to cure defaults (indicating that the cure amount was $8,636.38, and also indicating that the total amount required to pay-off the loan was $10,999.04).  [Def. Ex. 13.]  The November 1, 2006 FDCPA Letter gave Ms. Cunningham *30 days* after her receipt of the letter to dispute the debt in writing, and the letter also indicated that, meanwhile, Dovenmuehle was pursuing the foreclosure process with regard to the homestead.  As further explained below, this notice appears to be facially adequate to comply with Tex. Prop. Code § 51.002(d).  The problem is that Dovenmuehle did not wait until *after* the cure period set forth in this letter expired to issue the notice of foreclosure sale contemplated by Tex. Prop. Code § 51.002(b).

(e)  The November 13, 2006 Foreclosure Sale Notice [Def. Ex. 14].  The evidence showed that this notice was sent certified mail to Ms. Cunningham, and it did, indeed, give her the 21-days required notice of the intended December 5, 2006 foreclosure sale contemplated by Tex. Prop. Code § 51.002(b). However, the problem is that it was sent *before* the time had run under the § 51.002(d) notice – assuming that the November 1, 2006 FDCPA Letter was the § 51.002(d) notice.

6.  In further analyzing the notice issues in the case, the court emphasizes that there are really only three notices in evidence that matter:  (1) the July 26, 2006 Notice (sent

29

certified mail, but only giving ten days opportunity to cure); (2) the November 1, 2006 FDCPA Letter (sent certified mail, and giving 30 days opportunity to dispute the debt, if not cure); and (3) the November 13, 2006 Foreclosure Sale Notice that was sent out just twelve days after the November 1, 2006 FDCPA Letter. The court concludes that the November 13, 2006 Foreclosure Sale Notice, standing alone, would comply with Tex. Prop. Code § 51.002(b), *so long as there was first a notice that complied with Tex. Prop. Code § 51.002(d)*. But, in analyzing whether there was, first, a notice that complied with Tex. Prop. Code § 51.002(d), one must ask:

(a) What form of notice complies with Tex. Prop. Code § 51.002(d)?

(b) Can the July 26, 2006 Notice "count" as the Tex. Prop. Code § 51.002(d) notice, when it explicitly only gave *ten* days opportunity to cure, but in reality, Dovenmuehle waited until November 2006 (far more than 20 days) to send out a Tex. Prop. Code § 51.002(b) notice (so that Ms. Cunningham in reality had more than 20 days to cure)?

(c) Alternatively, can the November 1, 2006 FDCPA Letter "count" as the Tex. Prop. Code § 51.002(d) notice, when it explicitly gave *30* days opportunity to dispute (if not cure) the debt, and Dovenmuehle did not foreclose until after 30 days, but Dovenmuehle sent the Tex. Prop. Code § 51.002(b) notice out only *twelve* days later?

What Form of Notice is Required by Tex. Prop. Code § 51.002(d)?

7. With regard to the question of what form of notice complies with Tex. Prop. Code § 51.002(d), the answer is that section 51.002(d) does *not* dictate the form the notice should

take.  The only requirements under section 51.002(d) are that:
(a) the notice be written, (b) the notice be served on the debtor
by certified mail, (c) the notice must state that the debtor is
in default under the deed or trust or other contract lien, and
(d) the debtor must be given at least 20 days to cure before the
notice of sale can be given under section 15.002(b).  Tex. Prop.
Code § 51.002(d).  The Texas Appellate Court in Waco, while
noting that "[n]otice required by section 51.002(d) is obviously
a separate notice than that required by section 51.002(b)," like
this court, could find "no authority that has determined the
**nature** of the notice required by section 51.002(d)."  *Mills v.
Haggard*, 58 S.W.3d 164, 167 (Tex. App.—Waco, 2001, no pet.)
(emphasis added).  The specific contents of the notice of default
are not prescribed by the Texas Property Code.  Among other
things, the Fort Worth Court of Appeals has specifically noted
that a noteholder is not required under section 51.002(d) to
include the amount that would be due after acceleration.  *Powell
v. Stacy*, 117 S.W.3d 70, 74 (Tex. App.–Fort Worth, 2003).

    8.  In summary, there is no magic to the form of notice that
is required under section 51.002(d).  The key is that it be sent
by certified mail and simply notify the debtor that there is a
default and give the debtor at least 20 days to cure it.

<u>Must the 20-Day Opportunity to Cure be Explicitly in the Section
51.002(d) Notice, or is it Sufficient that the Debtor Ended up
Having More than 20 Days Cure?</u>

9.   Turning then to whether the July 26, 2006 Notice can

"count" as the Tex. Prop. Code § 51.002(d) notice, when it only

explicitly gave Ms. Cunningham **ten** days opportunity to cure, but

in reality, Dovenmuehle waited until November 2006 (far more than

20 days) to send out a Tex. Prop. Code § 51.002(b) notice, this

court looks to how the courts of the state of Texas have

interpreted this question when presented in similar contexts.

10.   In the case of *Fitzgerald v. Harry*, a mortgage borrower

asserted that certain demand letters did not comply with section

51.002(d) because the language of the letters did not offer him

20 days to cure.  *Fitzgerald v. Harry*, 2003 WL 22147557, *3 (Tex.

App.—Fort Worth, 2003) (no pet. h.).  The debtor received notices

of default and opportunity to cure on September 24, 1999 and

October 14, 1999.  His property was posted for foreclosure in

early-December 1999 and the debtor was notified of the

foreclosure sale by letter dated November 15, 1999.  *Id*.  The

debtor filed bankruptcy on December 3, 1999, preventing

foreclosure by virtue of the automatic stay.  That bankruptcy

case was dismissed on May 24, 2000.  On June 1, 2000, the lender

sent another notice of default and gave the debtor until June 12,

2000 to cure.  The debtor failed to cure and a notice of

foreclosure sale was sent on June 13, 2000 posting the property

32

for sale on July 4, 2000.  The debtor filed his second bankruptcy petition on June 30, 2000, and that bankruptcy case was dismissed on December 28, 2000.  On January 26, 2001, another notice was sent giving the debtor until February 9, 2001 to cure.  He did not cure, and on February 9, 2001, another notice of foreclosure sale was sent.  The house was sold at foreclosure (to the lender) on March 6, 2001.  *Id*. at *1-*2.  The debtor in *Fitzgerald* argued that none of the demand letters met the requirements of section 51.002(d) "because they failed to offer him twenty days to cure the alleged default."  *Id*. at *3.  But the court found that the first notice of default sent on September 24, 1999 actually explicitly gave the debtor 30 days to cure, and the debtor acknowledged receiving this notice.  So he admitted to receiving more than 20 days to cure by that September 24, 1999 notice.  *Id*. The court also found that, while the two notices of default given after dismissal of the first bankruptcy – the first giving 12 days to cure, and the second giving 14 days to cure – did not give the debtor 20 days to cure, there is no authority for the proposition that an intervening bankruptcy restarts the clock on notices of default and opportunity to cure under the Texas Property Code.  *Id.* at *4.  A lender is "not required to repeatedly provide notice of default and an additional twenty days to cure thereafter."  *Id*.  The September 24, 1999 notice was a compliant and effective notice of default, even as the actual

foreclosure did not occur until over a year later in March of 2006. *Id. See also Powell v. Stacy*, 117 S.W.3d 70, 73 (Tex. App.–Fort Worth, 2003) (a case where a debtor was given 21 days to cure in a statutory notice to cure, sent on May 31, 2000, but the notice of foreclosure was not given until November 6, 2000; the court noted that the debtors actually had 159 days to cure the defaults).

11. The court agrees with and follows the analysis of these cases. The July 26, 2006 Notice: (1) is in writing, (2) was served on the Debtor by certified mail, (3) stated that the Debtor was in default under the March 28, 2006 Agreed Order (and at least by implication, also under the note and deed of trust), but it (4) only gave the Debtor **ten** days to cure. The Debtor actually got over four months to cure, but that is not enough for the July 26, 2006 Notice to comply with the provisions of section 51.002(d). In the cases cited above, the notices of default that were found to be compliant **explicitly** gave at least **20** days to cure, in addition to the actual amount of time the debtor had to cure being much longer than the 20 days. In the *Fitzgerald* case, the court even noted that notices given after the dismissal of the debtor's bankruptcy cases (in June of 2000 and then again in January of 2001), but closer in time to the date of foreclosure (March of 2001), each of which gave less than 20 days to cure, did not, "standing alone, provide the required twenty-day-

34

opportunity to cure." *Fitzgerald*, 2003 WL 22147557, * 4.   The court in *Fitzgerald* went back to the original September 24, 1999 notice of default which **did** explicitly give at least 20 days notice to find that the debtor received adequate notice under section 51.002(d).

<u>Can the Tex. Prop. Code § 51.002(b) Notice be Sent Before the Time Runs Under the Tex. Prop. Code § 51.002(d) Notice?</u>

12.   Turning last to the question of whether the November 1, 2006 FDCPA Letter can "count" as the Tex. Prop. Code § 51.002(d) notice, when it explicitly gave notice of a default and **30** days opportunity to dispute the debt (if not cure the default),[11] and Dovenmuehle did not foreclose until after 30 days, but Dovenmuehle sent the Tex. Prop. Code § 51.002(b) notice only **twelve** days later?   This begs the question of **whether the Section 51.002(d) and (b) notices can overlap, with their time deadlines running concurrently**?

13.   The plain language of the statute suggests that the section 51.002(d) notice of default under a home mortgage must give "at least 20 days to cure the default **before** notice of sale **can be given**" under section 51.002(b) (emphasis added).   The most sensible way to read this statute is that the 20 days to cure

―――――――――――――

[11] The court here assumes that the November 1, 2006 FDCPA Letter is in sufficient form to constitute a Section 51.002(d) notice — although worded more in the style of a Fair Debt Collection Practices notification with explicit opportunity to "dispute" (as opposed to "cure") the debt.

must run before a mortgage lender is allowed to serve the notice
of foreclosure sale.

14. The court has found no Texas state court opinions that
state, unequivocally, that the 20 days on the section 51.002(d)
default notice must run/conclude before the section 51.002(b)
notice of foreclosure can be sent. However, there are certain
cases that imply this common sense interpretation. "[The Texas
Property] Code requires the holder of the debt to serve the
debtor in default under a contract lien on real property used as
the debtor's residence with written notice of the default, giving
the debtor at least twenty days to cure the default before notice
of sale can be given." *Herrera v. Emmis Mortgage, Inc.*, 1995 WL
654561 (Tex. App.–San Antonio, 1995) (unpublished, writ denied).
The Texas Appellate Court in San Antonio later noted that a
notice of default that was sent "more than 20 days prior to the
notice of foreclosure" was sent in accordance with section
51.002(d). *Salazar v. Steeplechase Owner's Assoc.*, 2000 WL
254035, *3 (Tex. App.–San Antonio, 2003) (unpublished, pet.
denied). The *Salazar* case clearly implies (as if it is obvious
to all concerned) that the notice of default/notice to cure time
must be at least 20 days prior to the notice of foreclosure. The
Waco Appellate Court in 2001 noted the Texas two-step process of
notification in section 51.002(b) and section 51.002(d) and the
20-day notice of cure requirement, and then concluded, "thus, a

36

notice-of-foreclosure on real property used as the debtor's residence is useless to the creditor unless proper notice-to-cure has been sent pursuant to Section 51.002(d)." *Mills v. Haggard*, 58 S.W.3d at 167.

15.  In summary, the November 1, 2006 FDCPA Letter did not "count" for the Section 51.002(d) notice in the case at bar. Dovenmuehle simply did not follow the two-step process set forth in Section 51.002(d) and Section 51.002(b) to properly foreclose on Ms. Cunningham's home.  Dovenmuehle did not have a compliant Section 51.002(d) notice before sending out its otherwise compliant Section 51.002(b) notice.

16.  Dovenmuehle's foreclosure was not statutorily compliant with the Texas Property Code.[12]

---

[12] The court notes that the Plaintiff has also argued that the foreclosure sale should be declared null and void since: (a) Dovenmuehle received inadequate consideration as far as the purchase price at the sale; and (b) Dovenmuehle's counsel's, in sending the November 1, 2006 FDCPA Letter and not properly responding to an alleged dispute by Plaintiff of the debt set forth in that letter (made by Plaintiff in Pl. Ex. 7) did not comply with the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA")(this later theory/claim was not pleaded by Plaintiff or raised in the Pretrial Order).  The court does not believe that it is necessary to address these arguments in detail, since it has held above that the foreclosure sale was wrongful in that Dovenmuehle did not comply with Tex. Prop. Code § 51.002(d) and (b).  However, the court notes that: (a) inadequate consideration alone is not a justification for setting aside a foreclosure sale (*BFP v. RTC*, 511 U.S. 531 (1994)); and (b) certain courts have persuasively held that a debt collector's noncompliance with the FDCPA is not a defense to an action such as an eviction or foreclosure, but merely gives a private party the right to seek monetary damages against the debt collector.  Specifically, while the statute provides a shield to debtors to eliminate abusive, deceptive, and unfair debt collection practices by debt collectors, 15 U.S.C. § 1692(a), the FDCPA was not intended to be used by debtors as a sword to attack the merits of an underlying action, such as a

**B.  Setting Aside the Foreclosure Sale Versus Monetary Damages.**

17.  Having determined that the foreclosure sale did not
comply with the Texas two-step process required under Tex. Prop.
Code § 51.002(d) and (b), this begs the question of what the
proper remedy is here.  The evidence is that there are
third-party purchasers for value who bought the homestead at the
foreclosure sale (Easterview Trust 2433) and in subsequent sales
after December 5, 2006 (Couch Enterprises, LLC and O.C.C.M.,
Inc.), who had no connection to the Debtor, nor to Dovenmuehle,
and who never had any reason to know there were any problems
afoot.  They are good faith purchasers for value, according to
all undisputed evidence, who have been in unfortunate "limbo" for

---

foreclosure.  *See Missionary Sisters of the Sacred Heart, Inc. v.
Dowling*, 703 N.Y.S.2d 362, 368 (N.Y. City Civ. Ct. 1999) (landlord's
rent demand drafted by counsel even if violative of provisions of
FDCPA, would not serve as a defense in an eviction proceeding, but,
rather would give rise to possible civil, monetary damages against
landlord's agent/debt collector under FDCPA's civil liability
provisions).  *Accord Barstow Road Owners, Inc. v. Billing*, 687
N.Y.S.2d 845, 850 (N.Y. Dist. Ct. 1998) ("It is unlikely that Congress
foresaw the FDCPA being used as a vehicle to dismiss a legal
proceeding commenced by a landlord under state law to reclaim
possession of his/her real property").  *See also* other authority cited
in *Missionary*, including *Romea* v. Heiberger & *Assoc.*, 988 F.Supp. 715
(S.D.N.Y 1998).  The FDCPA contains no express provision for
injunctive or declaratory relief in private actions.  *See* 15 U.S.C.
§ 1692(k) (listing damages and counsel fees as remedies, but not
declaratory, injunctive or other equitable relief).  Most courts have
found equitable relief unavailable under the statute, at least with
respect to private actions.  *See Bolin v. Sears, Roebuck & Co.*, 231
F.3d 970, 977 n.39 (5th Cir. 2000) ("although this circuit has not
definitely ruled on the issue, courts uniformly hold that the FDCPA
does not authorize equitable relief").  Moreover, Dovenmuehle's
counsel, the "debt collector" who sent the November 1, 2006 FDCPA
Letter and would be the target of any FDCPA violation, was not named
as a party in this Adversary Proceeding.

more than a year – having invested money in the house for
financing costs, taxes, and other fees, but never having taken
physical possession of the property (nor earned any rent or
income from it) because of the uncertainty raised in this
Adversary Proceeding.  In the face of this, can this court set
aside the foreclosure sale and declare it null and void?  No.

18. The appropriate remedy here, where there have been
subsequent purchasers, even where there has been an **invalid**
foreclosure sale, is to award damages to Ms. Cunningham for the
wrongful foreclosure.

19.  "In a wrongful foreclosure suit the measure of damages
is the difference between the value of the property in question
at the date of foreclosure and the remaining balance due on the
indebtedness." *Farrell v. Hunt*, 714 S.W.2d 298, 299 (Tex. 1986)
(denying relief to the mortgagor where mortgagor failed to show
all of the elements of wrongful foreclosure).  Damages in a
wrongful foreclosure action "are awarded on a theory of
conversion of the mortgagor's property due to the sale, and are
especially appropriate when the property has passed to a third
party by the means of the sale." *Burnett v. Manufacturer's
Hanover Trust Co.*, 593 S.W.2d 755, 757 (Tex. Civ. App.–Dallas
1979, writ ref'd n.r.e.).  *See also Black v. Burd,* 255 S.W.2d
553, 556 (Tex. Civ. App.–Fort Worth, 1953, writ ref'd n.r.e.)
(noting that the rule that the measure of damages is the value of

the land at the time of sale, less the mortgage debt, and that such damages are particularly appropriate where title has passed to a third party who purchased in good faith without notice and for good value).

20.  Here, the evidence as to what the accrued debt was at the date of the transfer of the property is spotty.  There was some indication that the indebtedness owed by Ms. Cunningham at the date of the foreclosure sale was at or around $14,500 (the amount that the original third-party purchaser, Easterview Trust #2433, bid for the property).  Def. Ex. 15.  However, Ms. Cunningham has disputed that amount.  There was other evidence that the amount owed to Dovenmuehle on November 1, 2006 was $10,999.04.  Def. Ex. 13.  This seems credible to the court, given that the agreed amount of the indebtedness in mid-March 2006, pursuant to the March 28, 2006 Agreed Order, was $13,886.69 [Def. Ex. 7], and then the further evidence was that Dovenmuehle thereafter received $4,401.14 from the Chapter 13 Trustee under the confirmed Plan in Case #2 [Def. Ex. 23].  Additionally, we know that Ms. Cunningham was supposed to be making direct payments to Dovenmuehle after April 2006 of roughly $308 per month, but did not.  So it is easy to see that the balance owed to Dovenmuehle by Ms. Cunningham at November 1, 2006 could have been $10,999.04, as stated in Dovenmuehle's November 1, 2006 FDCPA Letter (because $13,886.69 minus $4,401.14 equals

40

*$9,485.55*, plus there were some missed payments in the amount of $308 each). But how could the balance owed to Dovenmuehle have gone from *$10,999.04* on November 1, 2006 to *$14,500* at the time of foreclosure on December 5, 2006? Perhaps because of one more missed payment ($308) *plus* some interest and attorney's fees associated with the foreclosure process. However, not only does the court not have any clear and direct evidence of how Dovenmuehle's exact indebtedness climbed from $10,999.04 on November 1, 2006 up to $14,500 on December 5, 2006, the court does not believe it is appropriate to use a number that has been grossed up to include attorney's fees associated with a defective foreclosure sale (which is what the court infers must be the reason for the majority of the difference between $14,500 and $10,999.04). Accordingly, the court concludes from the available evidence that it should assume that the balance owed to Dovenmuehle at the time of the foreclosure sale was *$11,307.04* ($10,999.04 + $308 — computed by taking the number used in Dovenmuehle's November 1, 2006 FDCPA Letter and adding in one more missed mortgage payment thereafter in the amount of $308).

21. Turning to the value of the homestead property, the best evidence of the value of the property at the date of foreclosure is $45,750 (according to the Dallas County Appraisal District records submitted as Pl. Ex. 6). Thus, the court initially computes the actual damages owed to Ms. Cunningham by

Dovenmuehle for the wrongful foreclosure at **$34,442.96** ($45,750 minus $11,307.04). Additionally, Ms. Cunningham's attorney testified credibly that he has incurred 50 hours of time on this matter at the rate of $250 per hour, for a total amount of attorney's fees incurred of $12,500. The court believes these to be reasonable in amount, under the circumstances, and they should be added to Ms. Cunningham's actual damages, for a total of **$46,942.96** that should be paid to her in damages by Dovenmuehle. This amount shall accrue interest hereafter at the federal judgment rate. In the event that Dovenmuehle appeals this matter to the United States District Court and is unsuccessful, Ms. Cunningham shall be awarded an additional $20,000 of attorney's fees. In the event that Dovenmuehle appeals this matter to the United States Court of Appeals for the Fifth Circuit and is unsuccessful, Ms. Cunningham shall be awarded yet another $20,000 of attorney's fees. In the event that Dovenmuehle appeals this matter to the United States Supreme Court and is unsuccessful, Ms. Cunningham shall be awarded yet another $20,000 of attorney's fees.

22. The court has considered whether there is egregious or bad faith conduct on the part of Dovenmuehle here to warrant punitive damages in favor of Ms. Cunningham. For example, there is the issue that nags at the court with regard to Dovenmuehle's proof of claim [Proof of Claim No. 3] filed in Case #1 (with the

42

page 2 attachment showing "Unpaid Principal Balance: $181,749.76"). Such proof of claim was never withdrawn or amended, according to the official Claims Register in Case #1. Proofs of claim are signed and filed under penalty of perjury and are what a Chapter 13 Trustee relies on in preparing or evaluating a final plan and whether it provides appropriate treatment. Also, there is Dovenmuehle's additional blunder with regard to Proof of Claim No. 7 filed in Case #2 (showing $50,109.23 owing to it – which was later admitted to be a mistake and corrected). The court believes that these erroneous proofs of claim may have played some minor role in the constant state of confusion that prevailed in both of Ms. Cunningham's Chapter 13 cases (with regard to whether or not there were arrearages owed to Dovenmuehle, with regard to how much the arrearages were, and with regard to whether Dovenmuehle should be getting paid through the plan or not). The court, as it indicated in footnote #9 herein, also has lingering concerns about what really was or was not withheld by Dovenmuehle in discovery in this matter (given the court's in camera review of Pl. Ex. 9, and given the importance that Def. Exs. 13 and 14 ultimately played in this trial). Finally, the court is not sure why this matter ever went to trial, when it should have been rather clear that Dovenmuehle did not have a Tex. Prop. Code Section 51.002(d) notice that would pass muster.

43

23. Nevertheless, the court refrains from awarding punitive damages in this matter. The court is not sufficiently convinced that Dovenmuehle's conduct has been anything more than grossly inattentive in this matter (as opposed to egregious or in bad faith). Dovenmuehle was inattentive in the Cunningham matter, no doubt, because of the relatively small dollars involved. This is very sad — since this was Ms. Cunningham's home for 25 years, and she deserved for people to be more attentive to her situation than they apparently have been, during her three-year nightmare in bankruptcy. However, the court believes that the law supports actual damages and attorney's fees being awarded to her, but not punitive damages.

## C. Request for Attorney's Fees by the Third-Party Purchasers.

24. The Defendants in this matter, who were good faith third-party purchasers for value (the Easterview Trust; Couch Enterprises, LLC; and O.C.C.M., Inc.; hereinafter the "Couch Parties"), have asked for reimbursement of their attorney's fees in this matter.

25. The court has not been provided with any support in contract or in law for this request for attorney's fees, and the court has found no authority that supports this request.

26. The court notes that Tex. Prop. Code § 51.009 provides that a purchaser at a foreclosure sale takes at its own risk, without any warranties express or implied, except as to

44

warranties of title. This suggests to the court that the Couch Parties purchased the property, bearing all risk that litigation could ensue, and that they would have to bear the cost of that litigation.

27. However, the court does believe that the Couch Parties should be entitled to claim back against Ms. Cunningham for her use or rental of the house from December 5, 2006 through the date of this decision clarifying the Couch Parties' clear right and title in the property. The evidence was that Ms. Cunningham has never been evicted — although she has, for her own personal reasons, not stayed at the house during much of the period from February 2007 through the present (*i.e.,* due to health issues and trips in and out of the hospital, and time spent with a family member). Ms. Cunningham has stored personal property at the homestead, though, at all times (never having really moved out).

28. There is no evidence of what the fair rental value is on the homestead property. We only know that Ms. Cunningham's house payment was approximately $300 per month during the relevant time periods during her bankruptcy cases. Thus, the court will assume (in the face of no other offered evidence) that $300 per month is a fair rental value on this property. Since Ms. Cunningham has had access to the house rent free from December 2006 through March 2008, while the Couch Parties have waited for a determination in this lawsuit, the court holds that

45

Ms. Cunningham should pay the Couch Parties $4,800 ($300 per month times 16 months, for the fair rental value of the property up through March 2008), out of the $43,750 award she receives from Dovenmuehle. The $4,800 shall accrue interest henceforth at the federal judgment rate. Additionally, the $300 per month will continue to accrue for each month that Ms. Cunningham stays in the property after March 2008, but the $4,800 award can only be recovered from her to the extent she receives her $46,942.96 recovery from Dovenmuehle.

<u>CONCLUSION</u>

A judgment will be separately issued consistent with this Memorandum Opinion.

####END OF MEMORANDUM OPINION###